# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**LEE A. NEWSOME,**

**Plaintiff,**

**-vs-**                                                      **Case No.  6:05-cv-235-Orl-KRS**

**COMMISSIONER OF SOCIAL SECURITY**

**Defendant.**

_____

## ORDER

This cause came on for consideration on the Complaint filed by Lee A. Newsome seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for social security benefits.  Doc. No. 1.  Newsome seeks disability benefits under the Federal Old Age, Survivors and Disability Insurance Program ("OASDI" or the "Act"), 42 U.S.C. § 401 *et seq*., based on the working record of her deceased father.  R. 80-83.  To qualify for these benefits, Newsome must prove that she was disabled before she became twenty-two years old on July 15, 1997.  42 U.S.C. § 402(d)(B)(ii); 20 C.F.R. § 404.350; R. 83.

The Commissioner answered the Complaint and filed a certified copy of the transcript of the proceedings before the Social Security Administration ("SSA").  Doc. No. 10.  Pursuant to the consent of the parties, this case has been assigned to me for disposition.  Doc. Nos. 13, 14.

**I.     PROCEDURAL HISTORY**.

Newsome alleges that she became disabled on January 1, 1988.  R. 80-81.  The

SSA denied her application initially and on reconsideration.  R. 67-69, 72-74.  Newsome

requested a hearing before an Administrative Law Judge ("ALJ"), who held a hearing on

July 22, 2002.  R. 26-56.  On September 25, 2002, the ALJ issued a decision denying

Newsome's claim.  R. 12-19.  The Appeals Council declined to review the ALJ's decision.

R. 2-3.

Newsome then sought review in this Court.  *Newsome v. Barnhart*, Case No. 6:03-

cv-320-ORL-KRS.  On March 24, 2004, I entered an Order reversing the Commissioner's

decision and remanding the case for further proceedings.  R. 439-47.  Based on this

Order, the Appeals Council vacated the decision of the ALJ and remanded the case for

further proceedings.  R. 453.

The ALJ held a supplemental hearing on October 5, 2004.  R. 471-95.  Newsome,

her sister Rebecca Newsome, and Julianna Hey, a VE, testified.  Newsome was

represented by Lori Rayborn, who worked with counsel of record in the present case.[1]  R.

473.

After considering the testimony and evidence in the record, the ALJ determined

that Newsome had not engaged in substantial gainful activity since the alleged onset of

her disability.  R. 422.  The ALJ concluded that Newsome had the following severe

impairments: a history of hydrocephalus, endometriosis, chest pain, headaches, vertigo

_____

[1]  It is not clear whether Rayborn is an attorney.

and disequilibrium.  These impairments, singly and in combination, did not meet or equal

any impairment listed in the SSA regulations.  R. 426.

The ALJ found that Newsome had the residual functional capacity ("RFC") to do

the following:

> [L]ift and/or carry up to 10 lbs. occasionally; stand and/or walk
> about 2 hours in total in an 8-hour workday; and sit for about
> 6 hours in total in an 8-hour workday.  She could only
> occasionally climb and balance.  The claimant also had
> environmental restrictions in that she was precluded from
> working in proximity of moving machinery or at unprotected
> heights.

R. 427.  In reaching this conclusion, the ALJ stated that she gave "the greatest possible

benefit of the doubt to [Newsome's] allegations. . . ."  *Id*.  She also placed great weight

on the RFC assessments of reviewing physicians because they were consistent with the

evidence as a whole including the opinion of Dr. Scheinblum, a treating physician.  *Id*.

She gave less weight to the opinion of Dr. Lavender, an examining physician, because

Dr. Lavender examined Newsome almost four years after she turned twenty-two, and

because Dr. Lavender's opinion was inconsistent with other evidence in the record.  *Id*.

The ALJ found that Newsome had no past relevant work.  R. 428.  The ALJ relied

on the testimony of the VE that a person with Newsome's functional capacity could

perform jobs available in significant numbers in the national economy, specifically food

checker (DOT 211.487-014), food and beverage order clerk (DOT 209.567-014), and

checker (DOT 209.687-010).  R. 428-29.  Because there were jobs available that

Newsome could have performed, the ALJ concluded that she was not disabled.  R. 429.

Newsome timely filed her complaint in this case seeking review of this decision.

## II.      JURISDICTION.

The Commissioner issued a final decision after a hearing with respect to Newsome's application for disability benefits.  Therefore, the Court has jurisdiction of this matter under 42 U.S.C. § 405(g).

## III.     STATEMENT OF FACTS.

### A.      Newsome's Testimony.

Newsome was born on July 16, 1975.  R. 83. She is a high school graduate and has an associate's degree.  R. 33.  She was enrolled in a physically impaired student program in high school.  R. 49-50; *see also* R. 148.  She completed her high school courses at an adult school because she frequently missed high school due to vertigo and dizziness.  R. 40, 50, 481; *see also* R. 166, 178.  Her sister attended most of her classes for the Associate's Degree and took notes; Newsome attended classes only occasionally. On days when tests were given, Newsome's sister took Newsome to school so that she could take the tests.  R.  41, 53-54, 484; *see also* R. 317.  Newsome estimated that she attended classes one to three days a week for about one hour at a time.  R. 478. Newsome did not obtain a Bachelor's degree because she frequently missed classes due to vertigo, headaches and nausea.  R. 34, 484.

As early as fifth or sixth grade, Newsome began having vertigo, dizziness and migraine headaches.  R. 39, 44, 476.  When dizzy, she could not walk without support. R.  35. Smells, such as perfumes, would cause vertigo and dizziness.  R. 42-43, 479. She would often sleep most of a day to deal with these problems.  R. 43, 477. Medication did not relieve her vertigo.  R. 46, 476.  She did not drive an automobile

because she was afraid that she would pass out.  R. 44.  On one occasion, Newsome passed out in a car while riding with her sister.  R. 54.

Newsome's headaches caused a sharp pain and were exacerbated by exposure to sunlight and noise.  R. 35-36, 479.  Any movement of her head aggravated these conditions.  R. 38.  She sometimes had double vision and other times she could not see at all.  R. 44, 482. Her headaches lasted from a couple of hours to an entire day.  R. 43. She took Advil for headaches.  R. 38.  She would also lie in a dark and quiet room to relieve the headaches.  R. 43.  She also had generalized pain that lasted most of the day.  R.  45, 477.

Newsome went to the Navy hospital for treatment, R. 37, but her ability to get medical treatment was limited after the base closed because civilian doctors would not accept her insurance and, later, her insurance expired.  R. 52, 399.

Other than a part-time volunteer job at the school library during high school, Newsome never worked.  R.  34, 42.  Newsome was frequently absent from the volunteer job due to vertigo.  R. 42.

During the relevant period, Newsome did not perform household chores or participate in school organizations or clubs.  R. 39, 51.  She had difficulty carrying things due to vertigo.  R. 46, 479.  She needed to sit down most of the time because of fear of falling.  R. 479-80.  She would sometimes fall even when sitting.  R. 480.  She spent most of the day lying around the house or sleeping.  R. 51.  She could not stand long enough to take a shower.  R.  51.

*B.     Medical Evidence.*

Medical records indicate Newsome was evaluated for back pain and scoliosis in 1987.  R. 226-27.  Subsequent records indicate that her back pain had resolved and scoliosis had not progressed.  R. 227.  In November 1990, German Montoya, M.D., observed a history of headaches and trouble with school, and diagnosed unilateral hydrocephalus.  R. 119, 183.

Medical records show that Newsome was hospitalized in February 1991, based on complaints of daily headaches with abdominal pain and nausea.  R. 112-13.    Michael D. Pollack, M.D., concluded after testing that Newsome probably had unilateral hydrocephalus, but that psychological factors were likely contributing to her symptoms.  R. 115.

Subsequent medical records reflect that Newsome continued to complain of chronic headaches, including migraines, dizziness and vertigo, sometimes with blurred vision. *E.g.,* R. 111, 134-35, 137-38, 144, 146, 148, 150-51, 153, 59, 161-62, 164, 192, 200, 206-07, 220-21, 223, 237, 247; 313-14, 317.  Tests showed visual acuity of 20/50 in both eyes, and some low frequency hearing loss in both ears.  R. 201.  Medication often made her symptoms worse.  R. 144.

Allan F. Scheinblum, M.D., a neurologist, began treating Newsome sometime before December 20, 1993.  On December 20, 1993, he performed a neurological re-evaluation of Newsome.  At that time, Newsome complained that her dizziness and vertigo were occurring with increasing frequency.  She was missing school on a regular basis because she was too dizzy to function until the afternoon.  Dr. Scheinblum

-6-

recommended neuropsychological testing because he had been unable to identify an adequate neurological basis for Newsome's symptoms.  R. 141, 144.[2]

Dr. Scheinblum evaluated Newsome again in August 1994.  She continued to complain of vertigo and dizziness.  She reported that she was unable to climb stairs because of the dizziness and a tendency to lose her balance.  Her headaches were not as significant a problem as they had been previously.  Dr. Scheinblum observed that the neuropsychological testing was basically within normal limits and inconclusive.  Dr. Scheinblum recommended that Newsome have a good general medical evaluation.  He further recommended that Newsome continue with appropriate restrictions to protect against injury related to dizziness and vertigo. R. 140.

Newsome continued to complain of abdominal pain.  R. 207, 237, 239, 242.  In March 2000, Fernando Tapia, M.D., diagnosed Newsome with endometriosis.  R. 307-08.

In February 2001, Newsome sought medical treatment because she was losing her balance and falling down.  Her hands and feet were numb, and she had headaches.  A physician's assistant assessed Newsome's condition as myalgias and weakness with vertigo and disequilibrium. R. 398.

In April 2001, Sam Ranganathan, M.D., examined Newsome at the request of the SSA.  Newsome complained of chronic dizziness, ringing in her ears, and occasional chest and abdominal pain.  She stated that she could sit all day, walk an hour and stand

––––––––––––––––––––

[2]  Based on the dates on the documents, it appears that R. 141 is the second page of the December 1993 report, the first page of which is found at R. 144.

-7-

fifteen to twenty minutes.  Dr. Ranganathan's impression was a history of endometriosis and hydrocephalus.  R. 338-39.

On May 10, 2001, Newsome was hospitalized due to a reported seizure.  Medical records reflect that she was dizzy.  The final impression of the attending physician was syncope, probable vasovagal.  R. 350-65.  Newsome returned to the emergency room on May 14, 2001, still complaining of extreme dizziness and headache.  While many tests were run, the records reflect that the etiology of her symptoms was unknown.  R. 366-84.

On June 7, 2001, Newsome was examined by Sheryl Lavender, D.O., for complaints of dizziness and headaches. Dr. Lavender offered no opinion on the underlying cause of Newsome's symptoms. Dr. Lavender noted that if Newsome continued to experience chronic headaches or vertigo it would be difficult for her to complete a task of any significance.  R. 385-88.

In December 2001, William H. Cooper, M.D., diagnosed Newsome's headaches as probable migraine and treated her with medication.  R. 394.  In April 2002, Newsome reported a syncopal episode (fainting), for which Dr. Cooper could find no clear etiology. R. 392.  A medical record dated May 13, 2002, reflects that Newsome continued to have occasional headaches and weakness, but no further syncopal episodes.  R. 391.

C.    *Reviewing Professionals.*

In April 2001, David Z. Kitay, M.D.,  prepared a physical RFC assessment based on a review of Newsome's records.  He concluded that Newsome had no exertional impairments, but that she should only occasionally climb and balance and should avoid concentrated exposure to hazards.  R.  342-49. In August 2002, Violet A. Stone, M.D.,

also prepared an RFC  assessment based on a review of Newsome's records.  She concluded that Newsome had no exertional limitations, but that she should avoid all exposure to hazards such as machinery, heights, etc., due to vertigo and dizziness.  R. 324-31.

>    D.    *Vocational Expert Testimony*.

The ALJ posed the following hypothetical to the VE: assume a younger individual with an associate's degree, no past relevant work, who is to avoid hazards such as machinery and heights, and who could occasionally climb and balance.  R. 486-87.  The VE opined that such a claimant could work as a food checker, order clerk (food and beverage), or checker.  R. 487.  These three jobs are all sedentary and unskilled or semiskilled.  R. 487.  The VE opined that available light duty positions would include fast food worker, cafeteria worker, and assembly.  R. 488.

The ALJ then added to the previous hypothetical additional limitations that restricted the hypothetical claimant to lifting twenty pounds occasionally, ten pounds frequently, with the ability to sit, stand or walk for six hours out of an eight-hour workday.  R. 488.  The VE opined that the claimant could still do the light duty work previously identified.  R. 488.

The ALJ then asked the VE to assume an individual of the same age, education and past relevant work.  This individual could lift ten pounds, stand or walk two hours and sit six hours in an eight-hour workday.   She must avoid exposure to hazards such as moving machinery and unprotected heights, and she could only climb and balance

occasionally.  R. 489.  The VE responded that this hypothetical claimant could perform the sedentary jobs previously identified.  R. 488-89.

Next, the ALJ asked the VE to assume an individual who could perform light work with additional restrictions of avoiding hazards such as moving machinery and unprotected heights, who could only occasionally climb and balance, and who could perform only simple, routine, repetitive tasks.  The VE responded that this person could perform the jobs of food checker and checker as well as the jobs of sorter, which required a sedentary level of exertion, and electronics assembler, which required a light level of exertion.  R. 490.

Finally, the ALJ asked the VE how reducing the last hypothetical individual's exertional capacity to sedentary, that is the ability to lift ten pounds, would affect the jobs the individual could perform.  R. 491.  The VE responded that this hypothetical claimant could perform the jobs of sorter, food checker and checker.  R. 491.

The VE acknowledged that any of these positions would involve some exposure to noise, which could reduce the an individual's ability to perform work if the noise caused vertigo, dizziness, or migraines.  R. 492-93.  The ability to perform the jobs would also be affected if the individual needed to lie down to deal with vertigo, dizziness or headaches.  R. 493-94.  Any bending or stooping that resulted in loss of balance or dizziness would also restrict the availability of jobs.  R. 494.

## IV.    STANDARD OF REVIEW.

To be entitled to Social Security disability benefits under OASDI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).  In a case seeking child's insurance benefits, the claimant must show that she is the child of a person insured under OASDI, was unmarried at the time the application for child's benefits was filed, was either under eighteen year of age (nineteen years of age for qualified students) or under a disability which began before age twenty-two, and was dependent on the insured parent.  42 U.S.C. § 402(d).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry which must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

(1) Is the claimant presently unemployed?

(2) Is the claimant's impairment severe?

(3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

(4) Is the claimant unable to perform his or her former occupation?

(5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. § 404.1520(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g., McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987) (per curiam).

This Court's review of a final decision by the SSA is limited to determining whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "'must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision.'"  *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987)(quoting *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)).  Even if the court finds that the evidence weighs against the SSA's decision, the court must affirm if the decision is supported by substantial evidence even if the proof preponderates against it. *Dyer*, 395 F.3d at 1210.  The court may not reweigh the evidence or substitute its own judgment, even if the court finds that the weight of the evidence is against the SSA's decision. *Id.* While there is a presumption in favor of the

-12-

SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).

## V.    ANALYSIS.

Newsome contends that the ALJ's decision was not supported by substantial evidence. Specifically, Newsome contends that the ALJ erred in assessing her credibility regarding the functional limitations arising from her impairments. She also argues that the ALJ erred by relying on the opinion of reviewing physicians and giving little weight to the opinion of Dr. Lavender, who examined Newsome. These are the only issues I will address.

*A.    Credibility.*

Under the law of this circuit, when an ALJ decides not to credit a claimant's testimony about subjective symptoms, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995). In this case, to support her conclusion that Newsome's "testimony [was] somewhat exaggerated to the extent that it alleged a sustained disabling impairment for the pertinent period at issue," the ALJ made the following findings:

1.    Newsome was able to attend school and obtain an Associate's Degree during the time when she was allegedly disabled;

2.    The medical records show no definitive basis for Newsome's symptomatology; and

-13-

> 3.    Newsome did not present records of any medical treatment from at least February 7, 1995, to February 4, 1998.

Substantial evidence in the record supports each of these findings.  The record also contains explanations for each of these points.  Newsome was able to attend school and obtain an Associate's Degree because her sister attended classes for her.  Medical record showed no definitive basis for Newsome's symptomatology, but physicians nevertheless credited her complaints and treated her for the reported symptoms.  Finally, the record shows that Newsome had financial difficulties on occasion that limited her ability to obtain medical care.

Nevertheless, the law requires that I affirm the ALJ's decision if it is supported by substantial evidence even if the proof preponderates against it.  Because the ALJ articulated specific and adequate reasons for her credibility findings, which reasons are supported by substantial evidence in the record, I conclude that the ALJ did not err in assessing Newsome's credibility.

> B.    *Treating Physician.*

Newsome argues that the ALJ erred by giving little weight to the opinion of Dr. Lavender that Newsome would have difficulty completing a task of any significance when she suffered from headaches or vertigo.  She asserts that it was improper to rely upon the opinions of reviewing physicians, rather than the opinion of Dr. Lavender, who was a treating physician.

"The law of this circuit is clear that the testimony of a treating physician must be given substantial or considerable weight unless 'good cause' is shown to the contrary. . .

-14-

. The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)(internal citations omitted).  The United States Court of Appeals for the Eleventh Circuit has found "good cause" "where the doctor[s'] opinion[s] [were] not bolstered by the evidence, . . . where the evidence supported a contrary finding[,] . . . [and] where the doctors' opinions were conclusory or inconsistent with their own medical records." *Id.* (internal citations omitted).

The ALJ correctly characterized Dr. Lavender as a non-treating source. R. 427. While she examined Newsome, it does not appear that she treated Newsome.  The ALJ further properly gave Dr. Lavender's opinion less weight because it was rendered almost four years after the date on which Newsome had to establish that she was disabled, that is, the date that she reached age twenty-two.

The ALJ also found that the RFC assessment of the reviewing physicians were consistent with the opinion of Dr. Scheinblum.  Dr. Scheinblum was one of Newsome's treating physicians during the alleged period of disability. The only functional limitations that Dr. Scheinblum articulated were that Newsome should have appropriate restrictions to protect against injury related to dizziness and vertigo.  Both Dr. Kitay and Dr. Stone, the reviewing physicians, concurred with Dr. Scheinblum's recommendation.  As such, the ALJ correctly stated that the reviewing physicians' opinions were consistent with the opinion of Dr. Scheinblum, a treating physician.

These explanations establish good cause to give less weight to the opinion of Dr. Lavender.  Accordingly, the ALJ did not err in her consideration of Dr. Lavender's opinion.

**VI.    CONCLUSION**.

For the foregoing reasons, the decision of the ALJ is **AFFIRMED**.  The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on March 22, 2006.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties